## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SERGIO MOGOLLON and COLLEEN LOWE, individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> THE BANK OF NEW YORK MELLON and GEORGE W. ARNETT III, <br><br> Defendants. | Civil Action No. <br><br><br> **COMPLAINT and** <br> **<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiffs Sergio Mogollon and Colleen Lowe, by and through undersigned counsel, bring this putative class action lawsuit on behalf of individuals and entities who were defrauded by The Bank of New York Mellon ("BNYM") and George W. Arnett III ("Arnett") (collectively, "Defendants") as a result of BNYM's role in facilitating the R. Allen Stanford Ponzi scheme described below. As a direct and proximate result of Defendants' conduct, Plaintiffs incurred substantial financial losses.

## I. <u>PARTIES</u>

1.      Plaintiff Sergio Mogollon is a citizen of and presently resides in Colombia.

2.      Plaintiff Colleen Lowe is a citizen of and presently resides in Jamaica.

3.      Defendant, George W. Arnett III ("Arnett"),[1] is a citizen of the State of New Jersey and presently resides at 1024 Califon Cokesbury Road, Lebanon, New Jersey 08833. Arnett is a licensed attorney in the State of New Jersey and has served in various legal and other capacities at BNYM and its affiliates, including as Managing Director and Senior Managing

---

[1]      Arnett was referred to as "Tres" by his fellow employees during his tenure at Pershing because the post-nominal "III" appears after his full name. "Tres Arnett" sometimes appears on documents, such as emails and memos.

Counsel of Pershing LLC and on BNYM's International Reputational Risk Committee ("IRRC").

4.      Defendant, The Bank of New York Mellon ("BNYM"), a New York state chartered bank, is one of two principal bank subsidiaries of BNY Mellon Corp., a Delaware corporation with headquarters at One Wall Street, New York, NY 10286.  BNY Mellon Corp. is the product of the July 1, 2007 merger of The Bank of New York Company, Inc. and Mellon Financial Corporation.  BNYM is the successor entity (post-merger) to The Bank of New York ("BNY").  BNYM conducts business at various locations in New Jersey, including Pershing in Florham Park, New Jersey, Pershing LLC in Jersey City, New Jersey, Pershing in Lawrenceville, New Jersey, BNY Mellon Wealth Management in Madison, New Jersey, DPM Mellon in Somerset, New Jersey, and BNY Mellon in Woodland Park, New Jersey.[2]

## II. VENUE AND JURISDICTION

5.      Jurisdiction is proper pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

6.      Venue is proper in the United States District Court in and for the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(1) as it is the judicial district in which a Defendant resides and 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district.

---

[2]      https://www.bnymellon.com/us/en/location-directory.jsp#filter/new-jersey.

### III. FACTUAL ALLEGATIONS[3]

**A.  Introduction**

7.     On February 17, 2009, the FINRA broker/dealer solely owned by Allen Stanford, Stanford Group Company ("SGC"), and solely-owned Antiguan bank, Stanford International Bank, Ltd. ("SIBL"), were raided and shut down by federal authorities amid allegations that the entities had violated federal securities laws by their integral involvement in the second largest Ponzi scheme in American history.  As a result, investors who purchased certificates of deposit ("CDs") issued by SIBL lost $7.2 billion.[4]

8.     The Court assigned to preside over Stanford-related cases concluded that Stanford and his entire network of Stanford companies operated as a single enterprise to perpetrate the massive, worldwide fraud.  The Court also determined that each Stanford entity either participated in the scheme, derived benefit from the scheme, or lent the appearance of legitimacy to the entirety of Stanford's fraudulent enterprise.  In other words, every Stanford entity, including SGC, Stanford Fiduciary Investor Services ("SFIS"), and SIBL, worked in concert with each other and with all other Stanford-related entities, as part of the Stanford

---

[3]     Plaintiffs did not discover the factual allegations against BNYM and George Arnett until the summer of 2014, at the earliest, through document production in a FINRA arbitration proceeding against Pershing.

[4]     *See* Revised and Redacted Amended Complaint [D.E. 82] in *Weatherly et al. v. Pershing LLC*, Case No. 14-cv-366 (N.D. Texas).  In a related case, the *Weatherly* Court granted in part and denied in part Plaintiffs' motion to unseal the unredacted first amended complaint and ordered that "because much of the remaining material is already in the public domain and the Court finds no compelling reason to override the presumption in favor of public access to court records, the Court directs Plaintiffs to refile a revised redacted First Amended Complaint."  *See* Order [D.E. 80] in *Weatherly et al. v. Pershing LLC*, Case No. 14-cv-366 (N.D. Texas).  The *Weatherly* Revised and Redacted Amended Complaint [D.E. 82] was subsequently filed.

enterprise, to defraud thousands of innocent people, by marketing and/or selling SIBL-issued CDs.[5]

9.      On December 27, 2005, Pershing LLC ("Pershing"), a wholly owned subsidiary of BNYM, entered into a clearing agreement with SGC and rendered material assistance to the Allen Stanford Ponzi scheme from 2005 through February 17, 2009.[6] Pershing's parent company, BNYM, also rendered substantial aid and/or support to the Stanford Ponzi scheme during this time period.

10.     The magnitude of the Stanford Ponzi scheme would have been impossible to achieve without Pershing/BNYM's indispensable material aid in growing SGC, thereby substantially increasing the sales of the SIBL CDs. Pershing, with BNYM's support, facilitated the increase of sales of SIBL CDs from approximately $2.8 billion between 1996 and the end of 2005 to more than $7.2 billion by the end of 2008.[7]

11.     Pershing and BNYM engaged in a relationship with SGC and the Stanford entities, including SIBL, for three and a half years despite being aware of countless badges of probable criminal activity as early as the spring of 2005,[8] when their relationship with Stanford commenced. Beyond the initial concerns about Stanford, Pershing and BNYM either never

---

[5]      *See* Order [D.E. 176] in *In re Stanford International Bank Ltd.*, Case No. 09-cv-721 (N.D. Texas).

[6]      *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82].

[7]      *Id.*

[8]      Notably, in 2005, BNYM should have exhibited a heightened level of awareness and due diligence into Stanford's operations in light of its promises to make "sweeping internal reforms to ensure compliance with its antifraud and money laundering obligations." The genesis of these promises was BNYM's involvement with fraudulent transactions and money laundering in an unrelated matter involving Russian and American bank accounts and other fraudulent transactions wherein BNYM's general counsel, managing counsel and other senior executives repeatedly ignored requirements to report illicit transactions until authorities intervened. As a result, BNYM paid a $38 million settlement in November 2005. *See* https://www.nytimes.com/2005/11/09/business/bank-settles-us-inquiry-into-money-laundering.html.

asked for or received answers to critical, due diligence related questions throughout the entire three-and-a-half-year period.[9]

12.     Nonetheless, Pershing, with BNYM's support and involvement, continued to provide vital services to the Stanford entities and thereby facilitate Stanford's Ponzi scheme. Pershing and BNYM rendered substantial assistance to Stanford by exercising professional expertise and judgment which was motivated by their own financial interests.  Pershing and BNYM's conduct impermissibly put their own financial interests before the interests of Plaintiffs, who suffered substantial financial losses as a direct and proximate cause of Pershing and BNYM's conduct. These facts, combined with the extended period Pershing and BNYM allowed Stanford to ignore and simply refuse to respond to its repeated questions, are more than sufficient to support the reasonable inference that BNYM and Arnett had a "general awareness" of Stanford's underlying wrongdoing.[10]

### B.  The Pershing/BNYM-Stanford Relationship

13.     In the first quarter of 2005, Stanford and Pershing began discussions about Pershing becoming SGC's clearing firm. At the time, SGC had been clearing trades with Bear Stearns.[11]

14.     But SGC was looking for more than just a clearing vendor – SGC wanted a new strategic business partner to assist it with its plan for the growth of its network of brokers (who would recommend and sell the CDs). Pershing/BNYM wanted to be that strategic partner.[12]

---

[9]     *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82].

[10]    *Id.*

[11]    *Id.*

[12]    *Id.*

15.     The anticipated and desired growth of SGC was the impetus for the Pershing/BNYM-Stanford relationship. At the outset, Stanford wanted and needed the credibility of having a relationship with a firm like Pershing and its parent company, BNYM, in connection with its plans for significant expansion. As demonstrated below, that credibility, or "reputational enhancement," from Pershing/BNYM was absolutely critical and was called upon time and time again to recruit FAs and grow SGC, and likewise to increase the sale of the SIBL-issued CDs. Pershing and BNYM were more than willing to give legitimacy to the Stanford enterprise in exchange for SGC's business and millions of dollars of revenue each year.[13]

16.     Not only was Stanford's relationship with Pershing and BNYM critical for recruitment, but Stanford also used the relationship as a selling point directly to investors.  For example, on October 6, 2006, Allen Stanford sent a letter to investors thanking them for placing their trust in Stanford and touting its new relationship with Pershing and BNYM:

> [W]e are pleased to inform you that we have chosen a new strategic clearing provider, Pershing LLC, to service your brokerage account at Stanford Group Company. Pershing is a leading global provider of clearing services consistent with our exacting standards, and is a wholly owned subsidiary of The Bank of New York Company, Inc. I am enclosing *Pershing Facts and Figures* along with *The Bank of New York at a Glance* for your review.

### i.  Pershing and BNYM's 2005 "Due Diligence" on Stanford

17.     Driven by its desire to gain the Stanford business at all costs, Pershing and BNYM performed perfunctory due diligence beginning in mid-2005, despite the existence of grave concerns and indicia of a fraudulent scheme.  Pershing's corporate policies mandated a heightened level of extensive due diligence for Introducing Broker-Dealers ("IBDs") such as SGC, because although SGC was a United States-based NASD member firm, it was affiliated with offshore banks, trust companies and broker-dealers with a significant non-US customer

---

[13]     *Id.*

base, substantial ownership by a non-US parent, and/or a location in a high-risk jurisdiction. This extensive due diligence should have been even more critical to Pershing and BNYM because in June 2005, Pershing was notified by Stanford's Chief Compliance Officer that the SEC was investigating the sales practices related to the SIBL CD.[14]

18.     Approximately one month after the news of the SEC's investigation into the SIBL CDs, from July 5 through July 8, 2005, Pershing's In-house Counsel Arnett,[15] Pershing's Global Chief Compliance Officer Claire Santaniello[16] and lead Relationship Manager John Ward traveled to SIBL in Antigua to gain an understanding of the bank, its operations and its investment product. Pershing/BNYM had an obligation to fully understand SIBL's structure, operations, client base, investment product (the CD) and underlying portfolio that controlled SIBL's ability to generate the referral fees that sustained SGC. Neither BNYM nor Pershing ever did so.[17]

19.     During this due diligence visit, Stanford explained that Pershing would wire their clients' funds to facilitate the purchase of the CD product.  Beyond Pershing's role enabling the purchase of the CDs, Stanford also discussed the CD product and its investment policy. Stanford represented that SIBL had an 11% return on its investments in 2004, yet Pershing never saw any documentation confirming that number.  Likewise, while Stanford talked about

---

[14]     *Id.*

[15]     Arnett was also the Chairman of Pershing's International Enhanced Due Diligence Committee and a member of BNYM's IRRC. During the period of 2005 through 2009, Arnett reported to Raymond Dorado of BNYM.

[16]     Claire Santaniello was Pershing's Global Chief Compliance Officer ("GCCO") and a member of Pershing's Credit Committee, Risk Management Steering Committee, IEDDC, Suspicious Activity Review and Oversight Committee ("SAROC") (Pershing's committee that monitored and reported suspicious activity), and eventually Pershing's Executive Committee.  Santaniello reported to both Pershing and BNYM and thus was the head of Global Compliance on behalf of both entities.

[17]     *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82].

SIBL's investment policy regarding allocation of the funds, their statements were not verified by any documentation that showed the specific investments that comprised their investment portfolio to support Stanford's talking points. Everything that Stanford told Pershing and BNYM was taken at face value. Stated another way, Pershing and BNYM did not "dig as deep" as they should have.[18]

20.    The July 2005 "due diligence" trip to SIBL was merely symbolic – to show that Pershing and BNYM were going through the appropriate motions in an attempt to protect themselves from future liability. Pershing and BNYM understood the significance of SIBL by virtue of its relationship with SGC, and the possible consequences associated with the relationship. However, when Pershing and BNYM did not get transparency into SIBL, its CD product or Allen Stanford, and their questions remained unanswered, Pershing and BNYM were undeterred. With the prospect of substantial revenue driving Pershing's decision-making, it did not want to jeopardize the prospective new relationship.[19]

21.    Following the trip, Pershing understood that SIBL and its CD sales were "the driver in [Stanford's] business model."[20] Arnett also understood out that SIBL was an offshore bank located in Antigua that offered credit cards to its customers.[21] Yet, Pershing and BNYM still did not have any answers to critical questions required to determine the legitimacy of the entire Stanford business model.

---

[18]    *See* Second Amended Consolidated Complaint [D.E. 138-1] in *Turk et al. v. Pershing LLC*, Case No. 09-cv-2199 (N.D. Texas); Brief in Support of Class Certification [D.E. 158-35] in *Turk et al. v. Pershing LLC*, Case No. 09-cv-2199 (N.D. Texas); *Weatherly* Revised and Redacted Amended Complaint [D.E. 82].

[19]    *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82].

[20]    *Id*.

[21]    *See* Notice of Filing of Documents Previously Under Seal [D.E. 178-24] in *Pershing LLC v. Kiebach et al.*, Case No. 14-cv-2549 (E.D. Louisiana).

22.     In September 2005, Pershing and BNYM engaged in the anti-money laundering ("AML") approval process for Stanford.  Upon information and belief, BNYM actively participated in the due diligence process and was responsible for overseeing its subsidiary.[22]

23.     During the due diligence review, Pershing and BNYM became aware that Allen Stanford had a close, symbiotic relationship with the Antiguan government – in fact Stanford was the island's largest private sector employer, bought the Antiguan newspaper and was a major source of funding for the entire island.  By 2004, the Antiguan government owed Stanford over $87 million – nearly half its annual tax returns – with certain loans secured by the government's tax revenues and medical fund.[23]

24.     Pershing also acknowledged that while Pershing was not directly doing business in Antigua, it was doing business with an entity that gets substantial revenue from an Antiguan bank.[24]

25.     Finally, on December 27, 2005, despite Pershing and BNYM's awareness of countless signs of highly suspicious activity, Pershing entered into a clearing agreement with SGC.  This decision was made despite knowledge of the following:

- Knowledge of a then-pending SEC investigation into SGC's sales practices relating to the SIBL CD in June 2005;
- Allen Stanford's intimate ties with the Antiguan government and his link to corruption in Antigua, including allegations that he bribed Antiguan officials for personal financial gain (Notably, an Antiguan government entity, the Financial Services Regulatory Commission ("FSRC"), was tasked with regulating SIBL);
- Allen Stanford's history of owning a bank on the Island of Montserrat, a known haven for money launderers, wherein Stanford forfeited more than $3 million in deposits that were linked to a Mexican drug lord;

---

[22]     *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82]; *Kiebach* Notice of Filing of Documents Previously Under Seal [D.E. 178-24].

[23]     *See Turk* Second Amended Consolidated Complaint [D.E. 138-1].

[24]     *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82].

- SIBL's historically consistent and remarkably high returns (double-digit returns on its investments for the preceding 15 years) despite fluctuating market conditions;

- SIBL's small, one-man accounting firm based in Antigua, which was highly unusual for the size and complexity of the Stanford enterprise;

- SGC's negative retained earnings that perpetuated SGC's acute dependence on revenues generated by the 3% referral fees from the sale of SIBL CDs (CD-related referral fees constituted 71.65% of SGC's revenue in 2004 and 63.62% in 2005);

- Allen Stanford's continual infusion of cash to maintain the broker/dealer's staggering overhead and consistent losses; and

- Stanford's general lack of transparency regarding source of funds, the construct of SIBL's investment portfolio and Allen Stanford's personal financial wherewithal.[25]

26.    Clearly, Pershing and BNYM were motivated to execute the agreement with Stanford and commence their relationship for one reason – their own greed.  Throughout the "due diligence" process, Pershing and BNYM did not concentrate on vetting Stanford, resolving open issues or ensuring that they were entering into a relationship with a legitimate and reputable broker dealer and related entities.  Rather, they were driven by their intense focus upon appropriating the more than $4.5 billion in assets cleared by SGC's previous clearing firm, Bear Stearns, with an additional potential custodial opportunity for BNYM.  All Pershing and BNYM wanted to know was how much money they were going to make from this relationship.[26]

### ii.  BNYM pitches its services to Stanford

27.    Despite knowledge of Stanford's fraud, BNYM and Pershing pitched BNYM's banking services to Stanford. At this time, BNYM touted itself as one of the largest U.S. Bank Holding Companies and the Best Custody Bank.  BNYM turned a blind eye to Stanford's fraud

---

[25]    *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82]; Second Amended Complaint [D.E. 952] in *SEC v. SIBL et al.*, Case No. 09-cv-0298 (N.D. Texas); *Turk* Second Amended Consolidated Complaint [D.E. 138-1].

[26]    *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82].

because it was motivated by Pershing's opportunity to clear $4.5 billion in assets, as well as its own opportunity to provide institutional and private wealth custody services to Stanford.[27]

28.    In September 2005, Pershing pitched BNYM's Directed Trust Services to Stanford.  Pershing also offered the following BNYM services to Stanford: Leveraging the BNYM Wealth Management team for private banking products such as lines of credit, standby letters of credit, aircraft loans, unsecured credit, and other lending alternatives; and Securities Based Lending Solutions, including CreditAdvance, a margin lending product, LoanAdvance, a consumer lending product, RealAdvance, a mortgage solution offered by Bank of New York Mortgage Solutions LLC, and Collateral Monitoring Service.[28]

29.    Furthermore, in December 2006, Richard Brueckner[29] discussed "the BNY/Mellon deal" with Danny Bogar of Stanford.[30]

### iii.  Pershing/BNYM's ensuing relationship with Stanford

30.    In connection with trying to grow their own businesses, Pershing/BNYM assisted Stanford in attaining its own exponential growth.  To grow SGC, and in turn the sale of SIBL CDs, Pershing/BNYM actively assisted in recruiting financial advisors ("FAs") for SGC (a practice that began months prior to entering into a contractual relationship). Pershing/BNYM knew these FAs would recommend and sell the SIBL CDs to their customers. However, since Stanford was not well known to FAs with large books of business at the top

---

[27]    *Id.*

[28]    *Id.*

[29]    Richard Brueckner was the CEO of Pershing from 2001-2010. As CEO of Pershing, Brueckner reported to Gerald Hassell, then-President of BNYM.  While Brueckner was CEO at Pershing, he also served as senior executive vice president of BNYM – a dual Pershing/BNYM executive.  Brueckner went on to serve as Chief of Staff at BNYM from October 2011 to September 2015.

[30]    *See Kiebach* Notice of Filing of Documents Previously Under Seal [D.E. 178-24].

broker-dealers around the country, Pershing/BNYM lent irreplaceable "reputational enhancement" to the Stanford enterprise by promoting the Pershing/BNYM partnership with SGC. This was referred to internally as "selling the Pershing face" or "delivering the whole firm" – *i.e.*, Pershing and BNYM. The use of Pershing/BNYM's reputational enhancement was successful. In addition to prospecting financial advisors for SGC by touting the Pershing/BNYM name and partnership, Pershing assured recruits and existing FAs that Pershing/BNYM had thoroughly vetted Stanford to eliminate any apprehension that the FAs had about recommending the CD product to their clients. Nothing could have been further from the truth.[31]

31.     In addition to recruiting and reputational enhancement, Pershing/BNYM assisted in the transfer of funds to Stanford entities including SIBL.[32]

32.     Throughout 2006, Pershing continued to provide unabated assistance to Stanford. All the while, Pershing revisited its critical questions from its 2005 "due diligence" that were never answered. In mid-2006, when newly hired Director of Credit Risk Management Richard Closs was tasked with a "re-review" of Stanford, Stanford's refusal to provide transparency quickly resurfaced. Closs's independent review was intended to "identify and verify" the source of funds that were supporting SGC in the form of referral fees. Closs examined SGC's focus reports and SGC's financial statements and became concerned that:

- SGC was losing approximately $2-3 million per quarter;

- Approximately two-thirds of SGC's income was referral fee income from the SIBL CD sales (in Closs' 30 years of experience in credit risk, he had never seen a situation like the Stanford entities – where more than 50% of a U.S. based broker dealers' revenue was being generated from an offshore bank product);

---

[31]     *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82].

[32]     *See Kiebach* Notice of Filing of Documents Previously Under Seal [D.E. 178-24].

- Pershing did not have any information to confirm the profitability of the Stanford complex, specifically in light of SIBL's at least 12% hurdle rate for profitability (sum of the approximately 6% interest rate being paid plus the 3% commission and 3% overhead);

- Pershing did not have any transparency into SIBL's underlying securities; and

- Pershing did not have transparency into Allen Stanford's financial wherewithal, despite his capital contributions.

Pershing and BNYM <u>never</u> gained an understanding or received satisfactory answers to these critical concerns and questions. [33]

33.    In or around October 2007, in response to Pershing's requests to gain transparency into SIBL, Stanford told Pershing that it would need to go down to Antigua to review the SIBL portfolio information due to "Antiguan secrecy laws" prohibiting the statements from leaving the island of Antigua.  Despite the fact that SIBL and its portfolio were managed out of Memphis, Tennessee – not Antigua – Pershing took this information from Stanford at face value without researching the claim of Antiguan bank secrecy. [34]

34.    As a result, in January 2008, Richard Closs, George Arnett and John Ward traveled to SIBL in Antigua to meet with the financial regulators of Antigua (the FSRC), to meet with SIBL's external auditor (one-person accounting firm), review the work papers and audit of SIBL, and to review and reconcile the custodian statements.  However, this trip was destined for failure before it even began. [35]

35.    As Closs waited to board the plane to Antigua, Arnett and Ward informed him that the external auditor was not going to be present in Antigua (a fact that they knew in advance and would have caused Closs to cancel the trip). Once in Antigua, Arnett, Closs and Ward met

---

[33]    *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82].

[34]    *Id.*

[35]    *Id.*

with Danny Bogar, the president of SGC.  When Pershing asked Stanford to see the statements that they came to Antigua for, Pershing was told that Stanford decided not to give them to Pershing, claiming that the Antiguan laws would not allow them to.[36]

36.    Despite his purported expertise in money laundering laws (which are intended to protect the customer, not the bank), Arnett did not ask to see a copy of the Antiguan secrecy law, nor did he confirm the applicability or even the existence of the law. No such law exists.[37]

37.    Ultimately, Pershing was not allowed to review SIBL's internal reports and thus was unable to reconcile the assets.  Pershing internal memoranda reflect "mixed results" from this trip and indicate that Frank LaSalla and Ward had a call with Bogar of Stanford "to express [their] disappointment with the outcome of the Antigua visit" and "stressed the need to resolve" this outstanding issue. Pershing described this trip as "extremely disappointing" because "we were not going to get access to the information that we thought we were going to get access to and the reason we made the trip."  Specifically, Ward testified that the FSRC did not verify SIB's assets, but rather the FSRC merely obtained statements from SIB.  This admission is damaging to Pershing/BNYM, because they had knowledge that the FSRC did not verify the SIBL CD portfolio and that Pershing/BNYM should have taken decisive action sooner as they admittedly did not "get the transparency [they] were looking for."[38]

38.    In short, Pershing/BNYM's decision not to terminate the relationship with Stanford at this point is yet another clear indicator that it was complicit in the fraud. Pershing/BNYM accepted every excuse that Stanford made because it simply did not want to

---

[36]    *Id*.

[37]    *Id*.

[38]    *See Kiebach* Notice of Filing of Documents Previously Under Seal [D.E. 178-24]; In the Matter of Bogar, Young and Green, Division of Enforcement's Post-Hearing Brief.

learn the truth.    Pershing/BNYM also took the FSRC's representations as true, despite Pershing's knowledge that Allen Stanford had intimate government ties and had been accused of bribing government officials in Antigua (which turned out to be true in the case of Leroy King of the FSRC who is now under indictment for his participation in the Stanford Ponzi scheme).

39.    Rather than terminate the relationship, Pershing/BNYM attempted to give Stanford "another chance" and requested an independent audit of SIBL upon its return from Antigua. While Pershing/BNYM waited for Stanford to agree to this proposal, news broke in July 2008 that Stanford was under another investigation by the SEC for SGC's sales of the SIBL CDs.[39] This investigation was based on allegations made by two former SGC employees, that included SGC's failure to file forms with the U.S. Treasury Department, purging files and destroying documents related to an ongoing SEC investigation into the CD sales practices and providing false historical performance data for its securities.

40.    In August 2008, a Pershing executive filed the first of at least two incident reports relating to Stanford. This incident report regarding SIBL was based on information from a BNYM executive (during the time period when Pershing and BNYM were wiring funds for SIBL) and stated in part "[f]or some time, Pershing has been concerned."  Pershing's concerns with SIBL date back all the way to 2005.[40]

41.    In November 2008, Stanford advised Pershing/BNYM that it was not going to agree to an independent audit of SIBL, citing more pressing matters.[41]  Stanford's change of course regarding the independent audit is consistent with the game of "stall, delay and

---

[39]    *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82].

[40]    *Id.*; *See* Memorandum in Support of Louisiana Retirees' Motion for Summary Judgment [D.E. 178-23] in *Pershing LLC v. Kiebach et al.*, Case No. 14-cv-2549 (E.D. Louisiana).

[41]    *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82].

obfuscate" that Stanford had been playing with Pershing/BNYM since 2005 in connection with providing the money manager statements and Allen Stanford's personal financial statements. While Stanford consistently broke its "promises" to provide information to Pershing since 2005, Pershing/BNYM chose to remain Stanford's strategic partners.

42.    In December 2008, in connection with Pershing's review of SGC and SIBL, Pershing Executives, including Arnett, drafted an internal memorandum and listed the following issues to be aware of: 1) Unprofitability of Stanford Group, reliant on steady stream of capital contribution; 2) Stanford Group heavily dependent on referral fees from SIBL; 3) Stanford Group has entered into long-term contracts with HNW [high net worth] brokers so inability to attract customers to Stanford Group (because of problems at SIBL or lack of capital contributions or decreased referral fees) will impact profitability of Stanford Group; 4) Poor performance of SIBL could have negative impact on Stanford Group; SIBL must obtain a high investment yield on invested assets given cost of paying interest on CDs and paying referral fees to Stanford Group and other costs; 5) SIBL is based in a Tier Two country; and 6) Auditor of SIBL is a small local provider. Pershing further noted its "concerns relative to the continued ability of Allen Stanford to fund the BD," in light of the single shareholder structure.[42]

43.    Accordingly, Pershing held two meetings in New Jersey to discuss the Stanford relationship.  The first meeting, on or about December 10, 2008, was to discuss the range of options including 1) do nothing; 2) terminate the process of wiring funds to SIBL for the purchase of CDs; or 3) terminate the relationship with Stanford in its entirety.  Closs and Wallestad wanted Pershing to terminate its relationship with Stanford due to concerns about

---

[42]    *See Kiebach* Notice of Filing of Documents Previously Under Seal [D.E. 178-24].

Stanford's lack of transparency. Alternatively, Pershing's COO Brian Shea[43] proposed that Pershing terminate sending the wires to SIBL. Ultimately, on or about December 12, 2008, following the arrest of Bernie Madoff for perpetrating a Ponzi scheme, Pershing held its second meeting where it voted to stop the wires to SIBL only and not terminate the relationship, despite open speculation at this meeting about the possibility that Stanford could be a fraud like Madoff. Basically, the only way Pershing/BNYM would have terminated its relationship with Stanford would have been if Stanford admitted to Pershing/BNYM that it was engaged in a fraudulent scheme. Of course, this is because Pershing's annual revenue produced by its partnership with Stanford had grown to approximately $17,000,000 by 2008.[44]

44.     That same day, a Senior Executive in the Relationship Management department (Tom Meder) emailed Closs asking: "You think there'll [sic] be anymore like this [Madoff]?" Closs responded, "Hmmmmm....let me see, high profile name, money manager, large asset manager...Allen Stanford???" Three minutes later, Mr. Meder replied, "Bingo!!!!!!"[45]

45.     After its decision, Pershing informed Stanford that it would no longer be processing its third-party wires to SIBL. Stanford immediately requested a one-week extension to implement the new policy, and Pershing consented. The extension was not limited to one week, however, as Pershing continued to wire investor funds to SIBL until January 12, 2009.[46]

---

[43]     Brian Shea was the COO of Pershing from 2001-2010. He subsequently serviced as the President of Investment Services at BNYM and then Vice Chairman and CEO of Investment Services at BNYM. While at Pershing, Shea reported to Gerald Hassell, then-President of BNYM.

[44]     *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82]; *Kiebach* Memorandum in Support of Louisiana Retirees' Motion for Summary Judgment [D.E. 178-23].

[45]     *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82].

[46]     *See Kiebach* Memorandum in Support of Louisiana Retirees' Motion for Summary Judgment [D.E. 178-23].

46.     Nonetheless, at this time, Pershing internally decided to readdress the issue of repricing the clearing agreement with Stanford to provide lower fees and charges. Previously, in the first quarter of 2008, Stanford had requested a re-pricing to reflect its growth and other factors.  However, on May 19, 2008, Ward notified Stanford that while the issue with SIBL was still unresolved, Pershing would not consider any repricing discussions. Yet, in 2009, Pershing became aware of indications that SGC was looking to replace Pershing as its clearing firm with another competitor or to become self-clearing.  Pershing/BNYM's desperation to maintain the Stanford account led Pershing to offer price reductions and a contract extension on February 2, 2009. This plan was a "true WIN/WIN proposition."[47]

47.     On February 3, 2009, two weeks prior to the raid and shutdown, Mary McCullough, Senior Counsel for BNYM's Legal Department, Enforcement and Investigations Unit, emailed Arnett:

> I met with the Independent Examiner this morning, and they had some follow up questions on the Stanford International Bank matter that was presented to SIOC[48] last week. Basically, they are asking why the issue was not escalated to SIOC in January 2008 when Pershing first had concerns about a lack of transparency by Stanford. Also, they want to better **understand what triggered our concerns in 2008**. Finally they asked **whether any extra monitoring was being done on the questionable CD rates**. (emphasis supplied).[49]

48.     Although McCullough mistakenly believes that Pershing/BNYM's concerns only date back to January 2008 (upon information and belief, such concerns regarding Stanford's lack of transparency and questionable CD rates date back to 2005), this email is essentially an

---

[47]     *See Weatherly* Revised and Redacted Amended Complaint [D.E. 82].

[48]     Upon information and belief, "SIOC" is the acronym for BNYM's Sensitive Issues Oversight Committee.

[49]     *See Kiebach* Notice of Filing of Documents Previously Under Seal [D.E. 178-24].

admission that Pershing and BNYM did not take the proper steps to address their concerns about Stanford.

49.     In short, despite everything that occurred, the only obstacle that stopped Pershing/BNYM from continuing with their partnership with Stanford was the February 17, 2009 raid of Stanford's headquarters by federal authorities that shut down the Stanford scheme. However, it was already too late.

50.     Ultimately, in the three years of Pershing/BNYM's assistance, SIBL CD deposits increased from $2.8 billion to more than $7.2 billion.  While Pershing/BNYM had the ability to thwart the most successful years of Stanford's scheme by stopping it in 2005, Pershing/BNYM instead chose greed and profit at the expense of thousands of innocent victims.

## CLASS ACTION ALLEGATIONS

51.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of themselves and all members of the following Class:

> All persons or entities who purchased certificates of deposit from Stanford International Bank Limited between December 27, 2005 and February 16, 2009.

52.     Excluded from the putative class are the Defendants, their immediate family members, their affiliates, their subsidiaries, and any officers, employees, attorneys, agents, legal representatives, heirs, successors, and assigns.  Any officer, director or employee of Stanford Financial Group including SIBL, SGC, SFIS, or STC are also excluded.

53.     The persons affected by Defendants' unlawful acts consist of tens of thousands of individuals across the world, making joinder of all Class Members impracticable. Furthermore, the number of the persons who fit within the proposed classes are contained in Stanford's records which are held in custody by the Receiver and/or Antiguan liquidator and can be easily ascertained from those records.

54. Plaintiffs' claims are typical of the claims of the Class Members and arise from a single course of conduct by the Defendants. Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that Plaintiffs and the Class have suffered damages relating to Defendants' substantial participation in the Stanford Ponzi scheme. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members. The relief Plaintiffs seek is typical of the relief sought for the absent Class Members.

55. Plaintiffs and counsel will fairly and adequately protect and represent the interest of each member of the Class. Plaintiffs are committed to the vigorous prosecution of this Action and have retained competent counsel experienced in prosecuting class actions. Plaintiffs' interests are consistent with and not antagonistic to those of the other Class Members.

56. There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include, but are not limited to, the following:

a. Whether Defendants had a general awareness of Stanford's fraud;

b. Whether Defendants had a general awareness of Stanford's breach of fiduciary duty;

c. Whether Defendants provided substantial assistance to Stanford's Ponzi scheme; and

d. Whether and to what extent Plaintiffs and the Class were damaged by Defendants' conduct.

57. A class action is superior to the other available methods for the fair and efficient adjudication of the controversy because, among other things, it is desirable to concentrate the litigation of the Class Members' claims in one forum since it will conserve party and judicial

resources and facilitate the consistency of adjudications. Furthermore, absent a class action, Class Members would likely find the cost of litigating their individual claims prohibitively high and would therefore have no effective remedy at law. Because the damages suffered by each individual Class Member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class Members to redress the wrongs done to them individually, making class adjudication the superior alternative. Plaintiffs know of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.

<u>COUNT I</u>
**Aiding and Abetting Fraud**

58.     Plaintiffs repeat and incorporate by reference paragraphs 1-57 of this Complaint.

59.     Defendants aided and abetted the Stanford Ponzi scheme which defrauded tens of thousands of investors, including Plaintiffs herein.

60.     Defendants possessed a general awareness of Stanford's underlying fraud. Defendants had knowledge of the fraud primarily based on the August 2008 incident report (the genesis of which was information from a BNYM executive).

61.     Furthermore, BNYM's atypical conduct with respect to Stanford gives rise to a reasonable inference of knowledge:

- BNYM facilitated the sale of SIBL CDs (*e.g.*, fund transfer request wherein BNYM is the intermediary bank for funds wired to SIBL);

- BNYM's due diligence revealed the illegality of the scheme and provided BNYM with actual knowledge of the fraud;

- On February 3, 2009, Mary McCullough, Senior Counsel for BNYM's Legal Department, Enforcement and Investigations Unit, emailed Arnett: "I met with the Independent Examiner this morning, and they had some follow up questions on the Stanford International Bank matter that was presented to SIOC last week. Basically, they are asking why the issue was not escalated to SIOC in January 2008 when

21

Pershing first had concerns about a lack of transparency by Stanford. Also, they want to better understand what triggered our concerns in 2008. Finally they asked whether any extra monitoring was being done on the questionable CD rates"; and

• BNYM engaged in recruiting for Stanford.

62.    Defendants further encouraged and/or provided substantial assistance to the Stanford scheme based on 1) BNYM's involvement in recruiting; 2) BNYM's reputational enhancement; 3) BNYM's involvement in the transfer of funds to Stanford; and 4) BNYM's solicitation of Stanford's business.  Additionally, Arnett, who considers himself to be an authority or expert regarding legal issues pertaining to anti-money laundering in high-risk jurisdictions, disregarded Stanford's baseless claims regarding "Antiguan secrecy laws" as a justification for Stanford not providing critical information to Pershing/BNYM.

63.    The substantial assistance provided by Defendants gave a false sense of legitimacy to Stanford's illicit activities which allowed Allen Stanford and his associates to defraud plaintiffs and the class.

## <u>COUNT II</u>
### Aiding and Abetting Breach of Fiduciary Duty

64.    Plaintiffs repeat and incorporate by reference paragraphs 1-57 of this Complaint.

65.    A fiduciary relationship existed between Stanford and victims of the scheme who purchased SIBL CDs. Stanford FAs were in a superior position of knowledge, trust and confidence and as such, their obligations to Plaintiffs and the Class included a duty of loyalty and duty to exercise reasonable skill and care.

66.    The Stanford enterprise breached its fiduciary duty to Plaintiffs and the Class by selling fraudulent SIBL CDs in furtherance of a Ponzi scheme, thereby damaging Plaintiffs and the Class.

67.     Defendants possessed a general awareness of Stanford's breach of fiduciary duty by engaging in a fraudulent scheme. Defendants had knowledge of the fraud, and thus the breach of fiduciary duty, primarily based on the August 2008 incident report (the genesis of which was information from a BNYM executive).

68.     Furthermore, BNYM's atypical conduct with respect to Stanford gives rise to a reasonable inference of knowledge:

- BNYM facilitated the sale of SIBL CDs (*e.g.*, fund transfer request wherein BNYM is the intermediary bank for funds wired to SIBL);

- BNYM's due diligence revealed the illegality of the scheme and provided BNYM with actual knowledge of the fraud;

- On February 3, 2009, Mary McCullough, Senior Counsel for BNYM's Legal Department, Enforcement and Investigations Unit, emailed Arnett: "I met with the Independent Examiner this morning, and they had some follow up questions on the Stanford International Bank matter that was presented to SIOC last week. Basically, they are asking why the issue was not escalated to SIOC in January 2008 when Pershing first had concerns about a lack of transparency by Stanford. Also, they want to better understand what triggered our concerns in 2008. Finally they asked whether any extra monitoring was being done on the questionable CD rates"; and

- BNYM engaged in recruiting for Stanford.

69.     Defendants further encouraged and/or provided substantial assistance to the Stanford scheme based on 1) BNYM's involvement in recruiting; 2) BNYM's reputational enhancement; 3) BNYM's involvement in the transfer of funds to Stanford; and 4) BNYM's solicitation of Stanford's business.  Additionally, Arnett, who considers himself to be an authority or expert regarding legal issues pertaining to anti-money laundering in high-risk jurisdictions, disregarded Stanford's baseless claims regarding "Antiguan secrecy laws" as a justification for Stanford not providing critical information to Pershing/BNYM.

70.    The substantial assistance provided by Defendants gave a false sense of legitimacy to Stanford's illicit activities which allowed Allen Stanford and his associates to defraud plaintiffs and the class.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request that the Court enter judgment against the Bank of New York Mellon and George W. Arnett III, which:

1.    Certifies the proposed Class, designates Plaintiffs as the named representatives of the Class and designates undersigned counsel as Class Counsel;

2.    Awards to Plaintiffs and the Class compensatory, actual and other damages, including interest thereon, in an amount to be proven at trial;

3.    Awards pre-judgment and post-judgment interest, as provided by law; and

4.    Awards such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable as a matter of right on all counts in this Complaint.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiffs

By:    /s/ James E. Cecchi
JAMES E. CECCHI

Dated:  March 8, 2019

Michael E. Criden, Esq.
Lindsey C. Grossman, Esq.
**CRIDEN & LOVE, P.A.**
7301 SW 57th Court, Ste. 515
South Miami, FL 33143
Tel.: 305.357.9000
Fax.: 305.357.9050
mcriden@cridenlove.com
lgrossman@cridenlove.com